## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**
      *Plaintiff,*

                                Case No.     **17-CR-20083-02-JAR**

v.

**WAYNE B. CHAPIN, III,**
      *Defendant.*

---

## MOTION TO SEVER

---

Defendant Wayne B. Chapin, III, through counsel, Lance D. Sandage and Sarah G. Hess, moves the Court for severance from his co-defendant, Scott A. Tucker. Mr. Chapin's interest in a fair trial outweighs the Court's interest in judicial economy, permitting the Court to grant severance.

## FACTS

Mr. Chapin is charged in two counts of a three-count indictment. Count 1 charges that between September 2008 and October 20, 2011, Mr. Chapin conspired with Tucker to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service (IRS) of the Treasury Department in the ascertainment, computation, assessment, and collection of income tax. Count 3 charges that Mr. Chapin aided and assisted in the preparation and presentment of a false income tax return on October 20, 2011.

Mr. Chapin has one codefendant — Scott Tucker. Tucker is charged along

with Mr. Chapin in Count 1 with conspiracy to defraud the United States. Tucker is also charged in Count 2 with filing a false income tax return. The indictment alleges a conspiracy in which "Tucker orchestrated a sham sale of CLK [an entity owned by Tucker] to the Miami Tribe for $120,000[,]" while "Tucker continued to control CLK and the new [Miami Tribe entity] AMG."[1] Tucker allegedly owned and operated a group of payday lending businesses operating under various names. The indictment alleges Tucker used the "Native American tribes as nominees to operate his payday lending operations."[2] Additional allegations include Tucker's 2008 and 2010 IRS Form 1040 tax returns failed to include income "Tucker earned from his payday lending businesses."[3]

But this case is not Tucker's only criminal case. In February 2016, Tucker, along with Timothy Muir and Crystal Grote, were indicted in the Southern District of New York.[4] In November 2016, a superseding indictment was filed. In September and October 2017, Tucker and Muir proceeded to jury trial on three counts of conducting an enterprise's affairs through the collection of unlawful usurious debt, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.§ 1962(c); one count of conspiracy to do the same, in violation of 18 U.S.C. § 1962(d); one count of wire fraud and one count of wire fraud conspiracy, in violation of 18 U.S.C. §§ 1343, 1349; three counts of money laundering and conspiracy to

---

[1] Doc. 1, p.2.

[2] Doc. 1, p.3.

[3] Doc. 1, p.4-5.

[4] *United States v. Tucker*, No. 16-CR-00091-PKC (S.D.N.Y.).

launder money, in violation of 18 U.S.C. §1956(a)(1)(A)(i), (a)(1)(B)(i), (h); and five counts of making false statements in Truth and Lending Act (TILA) disclosures, in violation of 15 U.S.C. § 1611.[5] Tucker and Muir were convicted on all counts.

Tucker and Muir appealed their convictions, among other issues. In affirming the convictions, the Second Circuit related uncontradicted evidence showing, inter alia, that Tucker, "set up a sham transaction in which AMG, a company controlled by Tucker, 'purchased' CLK (using money controlled by Tucker) to give the appearance of tribal ownership[.]"[6] The court also found the facts of the trial established:

> Starting around 2003, Tucker formed relationships with a number of Native American tribes in order to create the appearance that Tucker's lending portfolios were owned and operated by the Tribes. Under the arrangement, the Tribe would claim to own one or more of the loan portfolios in exchange for one percent of the portfolios' revenues. […] Tucker continued to provide all the capital for the loans and bear the risk of default, as well as advertise, extend, administer, and collect on the loans from his offices in Overland Park, Kansas. He set up bank accounts in the Tribes' names and routed portfolio revenues to those accounts, but maintained control over the accounts and used them to fund both business expenses and personal expenses including race cars, a private jet, and a mansion in Aspen, Colorado. Tucker also used these accounts to pay the Tribes' one percent share of revenue, which went to other accounts that were in fact owned and controlled by the Tribes. While the Tribes claimed to "own" portfolios, Tucker maintained the ability to transfer "ownership" of a portfolio to a different nominal owner if he found the current nominal owner difficult to work with.[7]

---

[5] On or about August 29, 2017, Crystal Grote waived indictment and pled guilty to an information charging her with one count of making a false statement in a deposition before the Federal Trade Commission ("FTC"). She later testified for the government at the trial of Tucker and Muir.

[6] *United States v. Grote*, 961 F.3d 105, 117 (2d Cir. 2020).

[7] *Id.* at 112.

[...]

> Tucker and Muir also arranged a sham transaction in which one of the Tribes purportedly purchased Tucker's loan processing company, CLK Management ("CLK"), which then changed its name to AMG Services ("AMG"). For the purchase of CLK, which made hundreds of millions of dollars in annual revenue, the Tribe ostensibly paid Tucker just over $135,000. However, the money in fact came from an account controlled by Tucker, meaning that Tucker paid himself in order to make it appear that the company had been purchased by the Tribe.[8]

In addition, following its guilty verdict, the jury answered a special interrogatory:

> Has the government proven beyond a reasonable doubt that, at the time of collection of any of the loans you found as the basis of a guilty verdict on [the substantive RICO counts], the lender, in fact, was defendant Scott Tucker or an entity owned or controlled by him?"[9]

The jury answered, "Yes."[10]

Following the jury's verdict of guilt in the Southern District of New York, the government charged Tucker and Mr. Chapin in the District of Kansas. To be clear, the timeline of events occurred as follows:

- February 8, 2016 – the original indictment is filed in the Southern District of New York against Tucker, Muir, and Grote.

- September 11, 2017-October 13, 2017 – trial in the Southern District of New York against Tucker and Muir.

- October 13, 2017 – jury verdicts of guilty to all counts charged against Tucker and Muir.

- December 20, 2017 – the instant indictment is filed in the District of Kansas against Tucker and Mr. Chapin.

Also following their convictions in the Southern District of New York, Tucker

---

[8] *Id.* at 112-13.

[9] *Id.* at 113.

[10] *Id.*

and Muir appeared in the Netflix series, "Dirty Money," in an episode about Tucker.[11] Tucker was interviewed extensively. The interviews appear to be done during the pendency of the Southern District of New York's case against Tucker, but before he went to trial. The episode was released on January 26, 2018, following their convictions, and is summarized by Netflix: "Behind the lavish lifestyle of race car driver Scott Tucker lay a secretive lending empire built on tribal perks and profits from poor customers."[12] Viewer comments about the episode include:

- "When the attorney [Muir] said that with all the financial implications of the federal lawsuit would mean a life sentence for them, all I thought was, 'great! You deserve to suffer every second for every person you screwed over! I'm so glad they were convicted. I just wish it was a longer sentence."[13]

- "The Indian tribe was nothing more but one of Tucker's pawns. He takes credit for being a great businessman, but when incriminating documents come to light — he knows nothing about them. They wanted special treatment, but the FBI treated them just like any other common criminal. Ha ha. He should have gotten more prison time for sure."[14]

- The episode "showcases what these kinds of people [Tucker] are like. They never apologize. They continue to blame others. They take no responsibility. They do not care about others."[15]

---

[11] The discovery provided by the government to Mr. Chapin includes a video file entitled "Netflix 'Dirty Money' trailer" — a trailer of Tucker's episode.

[12] https://www.netflix.com/title/80118100

[13] F U Scott Tucker, review by korrayabousquet, available at https://www.imdb.com/title/tt7909178/reviews?ref=tturv

[14] Tucker cried all the way to PRISON!, review by The_Boxing_Cat, available at https://www.imdb.com/title/tt7909178/reviews?ref_=tt_urv

[15] Zero remorse, review by resitan, available at https://www.imdb.com/title/tt7909178/reviews?ref_=tt_urv.

The episode was also the subject of local news articles surrounding its release.[16] Mr. Chapin is not mentioned in the episode.

On January 13, 2021, the Supreme Court heard oral arguments in *AMG Capital Management, LLC v. Federal Trade Commission*,[17] a case not directly related to Tucker's criminal convictions. During oral arguments these comments were made:

- By Justice Alito: "What is the relationship between [the FTC order] in question here and the forfeiture order in the Southern District of New York in Tucker's criminal case? There, he was, as I understand it, required to return 3 billion dollars."[18]

- In response to Justice Barrett's questions regarding money getting repaid to victims, by Mr. Joel R. Marcus, attorney for the Federal Trade Commission: "We're not going to get the 1.3 billion dollars. A lot of it was spent and doesn't exist anymore, and you know, Tucker is now judgment-proof for the most part. But there were bank accounts, houses, race cars, whatever, assets that were seized and are being held basically in trust forever."[19]

- By Justice Barrett: "Your client [Tucker], I don't understand to be arguing that he has clean hands. I mean, he's been convicted. He has the dubious distinction of being the subject of an episode of "Dirty Money" on Netflix. […] is it your position that if we adopt your view, there's no way for the FTC to get the ill-gotten gains back from someone who has violated the law like your client?[20]

Justice Barrett's comments were also published in a Wall Street Journal article

---

[16] *See* Matt Campbell, *Payday loan shark Scott Tucker of Leawood is featured in Netflix's 'Dirty Money'*, The Kansas City Star (Jan. 11, 2018), available at https://www.kansascity.com/news/local/crime/article194154579.html.

[17] No. 19-508.

[18] *AMG Capital Management, LLC v. Federal Trade Commission*, Transcript of Oral Argument (Jan. 13, 2021) p.13 lines 6-12.

[19] *Id*. at p.58 lines 3-10.

[20] *Id*. at p.27 lines 4-9 & 17-19.

about the arguments. "Justice Amy Coney Barret suggested Mr. Tucker may have valid legal arguments but wasn't exactly a sympathetic defendant."[21] No mention of Mr. Chapin was made at oral argument.

The discovery here, as laid out by the government in its 2018 unopposed motion to designate the case complex, "includes approximately 8,965,115 individual files totaling approximately 1.20 terabytes of data."[22] Those 1.20 terabytes include "documents obtained from the Southern District of New York's investigation."[23] In fact, Mr. Chapin has received discovery from the government that totals approximately 1,750.3348 gigabytes or 1.75 terabytes of data. More specifically, the discovery produced here involves these productions from the Southern District of New York:

- 2016.03.04 Production 1 (103.15 GB for 113,027 files)
- 2016.04.05 Production 2 (23.5 GB for 44,356 files)
- 2016.06.01 Production 3 (12.95 GB for 24,698 files)
- 2017.01.12 Production 4 (69.45 GB for 22,414 files)
- SDNY Supplemental Discovery (1.37 GB for 6,286 files)
  - 2017.01.12 Production[24]
  - 2017.03.01 Production
  - 2017.06.30 Production
  - 2017.07.14 Production
  - 2017.08.04 Production
  - 2017.08.17 Production
  - 2017.08.22 Production
  - 2017.08.25 Production
  - 2017.08.28 Production
  - 2017.08.30 Production

---

[21] Brent Kendall, *Supreme Court Case Tests FTC's Powers to Recoup Ill-Gotten Gains*, Wall Street Journal (Jan. 13, 2021), available at https://www.wsj.com/articles/supreme-court-case-tests-ftcs-powers-to-rocoup-ill-gotten-gains-11610272799.

[22] Doc. 15, p.2.

[23] *Id.*

[24] This is a separate production to the one entitled "2017.01.12 Production 4" listed above.

- o   2017.08.31 Production
- o   2017.09.01 Production
- o   2017.09.08 Production
- o   2017.09.10 Production
- o   2017.09.11 Production
- o   2017.09.12 Production
- o   2017.09.18 Production
- o   2017.09.25 Production
- NY Files (221.13 GB for 395,801 files)

The discovery from the Southern District of New York, totals at least 431.55 gigabytes of data and at least 606,582 files. And these totals do not include the discovery provided by the government in Relativity format.[25] The Relativity files are at least an additional 731.76 gigabytes for 8,288,556 files. That brings the total Southern District of New York discovery provided to Mr. Chapin to 1,163.31 gigabytes or 1.163 terabytes. Thus, the discovery from the Southern District of New York represents over 66% of the entire discovery productions to Mr. Chapin here.

The charges in the Southern District of New York were alleged to have taken place from in or about 1997 through in or about August 2013 — more than 16 years. But the conspiracy here is alleged to have taken place only for approximately 37 months — from in or about September 2008 through on or about October 20, 2011[26] — within that larger timeframe. Mr. Chapin's first alleged offense conduct is in preparing Tucker's 2008 income taxes (i.e., sometime in 2009). Other than the allegations in the instant indictment, there are no allegations that Mr. Chapin had involvement in the conduct charged in the Southern District of New York including

---

[25] Relativity is an e-discovery software that offers review, production, document management, etc.

[26] Doc. 1.

the setup of CLK and/or AMG, the planning or organization of CLK and/or AMG, or the structuring of CLK and/or AMG. In fact, according to the Southern District of New York case, the setup, planning, organizing, and structuring of CLK and/or AMG was accomplished long before Mr. Chapin allegedly became involved with Tucker, and thus, any alleged conspiracy.

Mr. Chapin was only allegedly involved with Tucker for 37 months within the 192-month larger time frame encompassing the totality of Tucker's alleged criminal conduct.

## QUESTION PRESENTED

Defendants may be joined in one indictment when they participated in the same act or series of acts that constitute an offense. Even where defendants are properly joined, they may be severed when joinder appears to prejudice a defendant. Prejudice exists when the jury is prevented from making a reliable judgment about the defendant's guilt or innocence. Here, substantially more evidence exists against codefendant Tucker than against Mr. Chapin including specific findings by a jury of Tucker's criminal misconduct. And that evidence, including Tucker's convictions in Southern District of New York, **will** spillover in the jury's minds to impute guilt to Mr. Chapin. Should the Court sever the defendants?

## ARGUMENTS & AUTHORITIES

**I.    The Court should sever Mr. Chapin from his codefendant, Scott Tucker, because the risk of prejudice outweighs any interest in judicial economy.**

Rule 8 of the Federal Rules of Criminal Procedure allows for defendants to be joined in one indictment if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."[27] Courts generally prefer the efficiency of joining defendants. Mr. Chapin does not argue that he was improperly joined with Tucker.

However, even if the Court finds that the defendants were properly joined, Rule 14 limits whether the defendants should be tried together.[28] That Rule permits the Court to sever a defendant when the joinder "*appears* to prejudice a defendant or the government."[29] In considering severance, a court, "must balance two competing interests by weighing the prejudice to a particular defendant against considerations of economy and expedition in judicial administration.[30] To sever his case, a defendant must demonstrate "a serious risk that a joint trial would compromise a specific trial right" or "prevent the jury from making a reliable judgment about guilt or innocence."[31] This type of risk may occur "when evidence that the jury should not consider against a defendant and that would not be

---

[27] Fed. R. Crim. P. 8(b).

[28] Fed. R. Crim. P. 14.

[29] Fed. R. Crim. P. 14(a) (emphasis added).

[30] *United States v. Swena*, No. 0:03-CR-933 TS, at *3 (D. Utah Mar. 4, 2005) (citing *United States v. Pack*, 773 F.2d 261, 267 (10th Cir. 1985)).

[31] *Zafiro v. United States*, 506 U.S. 539 (1993).

admissible if a defendant were tried alone is admitted against a codefendant[,]" thus leading a jury to erroneously conclude a defendant's guilt based on evidence of a codefendant's wrongdoing.[32] For example, where evidence is "probative of a defendant's guilt but technically admissible only against a codefendant" severance-worthy prejudice may exist.[33] Put simply, when evidence against a codefendant poses a serious risk that the jury will convict the defendant, severance may be warranted.[34]

The Supreme Court has long recognized that conspiracies pose an even greater risk. Since conspiracies invite the "dangers of transference of guilt," the Court encourages lower courts to use "every safeguard to individualize each defendant in relation" to his codefendant.[35] In complex cases with multiple defendants with different degrees of culpability, "the risk of prejudice is heightened" when the defendants are tried together.[36] Courts have the option to employ less drastic measures to cure the risk of prejudice, including limiting instructions. But the higher the risk of prejudice, the more likely the court is to determine that separate trials are necessary.[37]

For example, in *United States v. Wiles*,[38] both defendants were charged with

---

[32] *Id.* at 539.

[33] *Id.*

[34] *Zafiro*, 506 U.S. at 539.

[35] *Kotteakos v. United States*, 328 U.S. 750, 774-75 (1946).

[36] *Zafiro*, 506 U.S. at 539.

[37] *Id.*

[38] No. 16-8074 (10th Cir. Jan. 26, 2018).

one count of conspiracy to operate an unregistered aircraft and one count of aiding and abetting the knowing and willful operation of an unregistered aircraft. The indictment stemmed from defendant Wiles' purchase of an aircraft which he and codefendant Lewis failed to register with the Federal Aviation Administration (FAA). After several suspicious landings, officers believed the men were involved in drug trafficking. Although no drugs were located during the execution of search warrants of the plane and hotel where the men were staying, officers did seize $259,717 and several fake driver's licenses. Before trial, defendant Lewis filed a motion in limine to exclude evidence of his prior 2010 misdemeanor conviction from his involvement in a marijuana drug smuggling group where 180 pounds of marijuana and $261,122 were seized. Both defendants also filed motions to sever.

During a motion hearing, the district court ruled that "while Lewis' prior conviction could not be received as evidence of Lewis' guilt as to the crimes alleged in the indictment, it was admissible for the limited purpose of showing '[his] planning, motive, [and] intent.'"[39] The court later denied the motions to sever, finding that the defendants had not shown actual prejudice or compromise of a specific trial right. However, in so doing, the court remained "cognizant that … Lewis' prior history …, if not considered and addressed with care, has the potential to tar Wiles with the same brush that will paint Lewis[.]"[40] Due to the circumstances, the court decided any risk could be "obviated through the use of a

---

[39] *Id*. at *5.

[40] *Id*. at 6.

limiting instruction."[41]

There are similarities between Mr. Chapin and defendant Wiles in *Wiles*. Both were and are faced with the prospect of being found guilty because of the prior actions of their respective codefendants. Like Wiles, Mr. Chapin faces a disproportionate amount of evidence against Tucker, including his prior convictions in the Southern District of New York. Many facts surrounding the convictions in Southern District of New York appear to be the same facts the government intends to put before a jury here in the District of Kansas. This will unnecessarily tar Mr. Chapin. But this case goes beyond the court's caution in *Wiles*. Here Mr. Chapin faces more than a tangentially related prior conviction of his codefendant. Mr. Chapin faces sitting next to a man, being associated with a man, being tried with a man, whom another jury has already found guilty of virtually identical facts supporting the offenses charged here.

The Tenth Circuit has held often that the risk of spillover evidence, alone, is not enough to justify severance; and, more simply, that the mere fact that more evidence exists against one defendant than another codefendant, is likewise, alone, not sufficient. But this case, is not like the other cases in which the Tenth Circuit has made these findings. This case includes the added element of the prior trial and conviction of a codefendant based on largely the same evidence that will be presented here. The government tested out its case in the Southern District of New York, and after learning their strategies and tactics succeeded, they decided to play

---

[41] *Id.* at 6.

the same game again here against Tucker. But this time, they dragged Mr. Chapin into a case where they now have an unfair advantage.

The government has provided Mr. Chapin with the discovery from the Southern District of New York — demonstrating the government's belief the offenses charged in both Districts are interrelated. Mr. Chapin has no reason to believe that the government will not present largely the same case against Tucker it did, successfully, in the Southern District of New York. But that same evidence does not exist against Mr. Chapin. Much of the evidence likely to be used to convict Tucker would not and does not contemporaneously implicate Mr. Chapin. Nor is much of the evidence against Tucker overlapping or intertwined with the evidence against Mr. Chapin. The evidence against Tucker is wider and deeper than it is against Mr. Chapin. Put simply, if even a Justice of the United States Supreme Court is biased against Mr. Tucker due to his conviction in the Southern District of New York and openly calls him a "dubious" defendant with unclean hands who has "violated the law," how can one expect any member of the jury to remain unbiased against Tucker? And if we can't expect a juror to remain unbiased against Tucker, isn't this the perfect case study of spillover prejudicing a codefendant, Mr. Chapin.

The spillover brought on by the sole actions of Tucker cannot be overstated. Tucker's agreement to provide sit-down interviews with the producers of "Dirty Money" was his decision and his alone. He did not seek the input of Mr. Chapin. Mr. Chapin did not appear in the documentary. In fact, Mr. Chapin has remained out of public view during the Southern District of New York case and the case before this

Court. Mr. Chapin has not sought interviews or public appearances. Mr. Chapin has not drawn attention to his alleged association with Tucker. Rather, Mr. Chapin has done everything in his power to ensure his case is tried in this criminal court and not through the media and streaming services like Netflix.

There must come a time when the court's interest in judicial economy yields to due process. If the jury may not decide each defendant's independent guilt or innocence, Rule 8's objectives are outweighed by the rights of defendants in a fair trial. Mere convenience does not mechanically trump the constitutional and historic protections afforded to individual defendants.[42]

Requiring Mr. Chapin go to trial with Tucker would prevent the jury from making a reliable judgment about Mr. Chapin's innocence. If this case proceeds to a single trial, the transference of guilt to Mr. Chapin from evidence presented against Tucker will undoubtedly taint the jury and prejudice Mr. Chapin's case. The jury's ability to differentiate Mr. Chapin's minimal conduct based on the specific evidence against or for him will be severely diminished with each stick of evidence against Tucker inevitably added to the fire. And it is not just the government who has and will add sticks to the pyre. Tucker has added plenty of his own kindling through the local and national news coverage, his participation and promotion of his "Dirty Money" episode, and his meritless claims[43] on appeal from his convictions. And at trial, as the government stokes the fire with the addition of each stick of the

---

[42] *See Kotteakos*, 328 U.S. at 774.

[43] *See Grote*, 961 F.3d at 109.

Southern District of New York evidence against Tucker, the cloud of smoke will engulf Tucker. It will not take long for the jury to become blinded by that smoke when struggling to clearly see Mr. Chapin's case. But once the smoke and fire are stoked, it will be too late. The smoke and fire made from the evidence of Tucker's wrongdoing will rage on to an unjust conviction of Mr. Chapin simply because the jury could not see him clearly.

Even just sitting at the defense table with Tucker unnecessarily raises the risk of clouding the jury's judgment. Once the jury learns that Tucker has been convicted in the Southern District of New York for similar conduct and believes him to be likewise guilty here, Mr. Chapin's chance at a fair trial will disappear. Not because the evidence against Mr. Chapin justifies it, but simply because Mr. Chapin will be seen as guilty by association. Because the risk of prejudice to Mr. Chapin is so high, his trial must be severed from Tucker's.

## CONCLUSION

Defendants cannot remain joined when the risk of prejudice to a defendant outweighs the court's interest in judicial economy. Mr. Chapin's case should be weighed without concern that the jury might convict him simply because he sits at the defense table with a convicted and further allegedly guilty person. Or simply because the government presented sufficient evidence of one offense but was lacking on the others. The Court should permit Mr. Chapin to be judged on the evidence against him and the merits of his case, without the prejudicial influence of his codefendant's evidence.

Respectfully Submitted,

SANDAGE LAW LLC


/s/ Lance D. Sandage
Lance D. Sandage, KS #17816
1600 Genessee Street, Suite 655
Kansas City, MO 64102
phone: 816.753.0800
fax: 816.735.4602
lance@sandagelaw.com

/s/ Sarah G. Hess
Sarah G. Hess, KS #26262
1600 Genessee Street, Suite 655
Kansas City, MO 64102
phone: 816.753.0800
fax: 816.735.4602
sarah@sandagelaw.com
ATTORNEYS FOR BRETT CHAPIN


# CERTIFICATE OF SERVICE

On February 12, 2021, I served this document by depositing an electronic copy of it in the Court's electronic filing system, which shall distribute notice to all attorneys of record.


/s/ Sarah G. Hess
Sarah G. Hess